1. Under the law of the case as made by the judgment overruling the motion to dismiss the petition, that the allegations as to the contract for virtual adoption and compliance therewith were sufficient to authorize *Page 283 
the jury, upon proof of such allegations, to return a verdict in favor of the petitioner, the verdict in his favor was authorized by the evidence.
2. The admission of testimony, over objection, that the money in the family of the defendant's intestate and her deceased husband, with whom it was alleged the contract for virtual adoption was made on behalf of the petitioner, was not error for any reason assigned, since the defendant in his answer pleaded substantially the same facts.
3. Under the law of the case as made by the judgment overruling the motion to dismiss the petition, as not setting forth a cause of action, the charge of the court, in substance that, if the jury believed that proof had been made of the facts alleged in the petition as to the contract for virtual adoption of the petitioner and compliance therewith, they would be authorized to return a verdict in his favor, was not error for any reason assigned.
 No. 16321. SEPTEMBER 14, 1948.
John Harold Lee filed in the Superior Court of Clayton County a petition against James H. Voyles, as administrator of the estate of Mrs. Alice Sherman, deceased, alleging in substance the following: The petitioner was born on October 1, 1909. Prior to his birth his mother had been committed to the Georgia State Hospital for the Insane at Milledgeville, Georgia, and she was granted a furlough from the said institution and permitted to return to the home of her mother in Atlanta, Georgia, for the purpose of giving birth to the petitioner. Soon after the birth of the petitioner, she returned to the said hospital and has since remained there on account of being incurably insane. Soon after the petitioner's birth, his father abandoned him and his older brother, Carson Lee, and his sister, Lois Clyde Lee, and thereafter neglected, failed, and refused to support them or to exercise any parental control over them. During the year 1917, when the petitioner was eight years of age, the defendant's intestate entered into a contract with the petitioner and his uncle, William Dunn, and his wife, Mrs. Bessie Dunn, with whom the petitioner resided and who stood in the relationship of loco parents to him. Under the terms of the contract it was agreed that the petitioner was to remove from the home of the Dunns to the home of Mrs. Alice Sherman and her husband, John Sherman, the petitioner's uncle, both of whom desired to have a child in their home, and to reside therein as a member of their household and as their own child *Page 284 
the relationship to be that of parents and child in so far as legally possible, and that the petitioner would inherit whatever estate the survivor of Mr. and Mrs. Sherman might leave at death. As a result of the said contract the said Mrs. Bessie Dunn and William Dunn surrendered their custody of the petitioner to the said Mrs. Alice Sherman and John Sherman, and the petitioner, pursuant to the said contract, went to the home of the said Mrs. Alice Sherman and John Sherman, and lived with them in their household, gave them the benefit of his services, accepted the relationship toward them of a child to parents, and performed all the obligations which the said contract imposed upon him. The petitioner, by reason of the performance of the contract by the Dunns and himself, is entitled to a specific performance of the contract on the part of the defendant in his representative capacity. At the time the petitioner went to reside with the said Shermans, neither of them had accumulated any substantial amount of property, but during the time the petitioner resided with them through the joint efforts of them and the petitioner they accumulated valuable real estate and a large amount of money, of which Mrs. Alice Sherman died seized and possessed. John Sherman died intestate on or about the ____ day of ____, and thereafter the petitioner and his wife returned to the home of Mrs. Alice Sherman, who was then in poor mental and physical health, and took care of and provided for her as long as her mental condition permitted. Mrs. Alice Sherman died intestate on May 21, 1942. At the time of her death she was seized and possessed of approximately $10,000 in cash and considerable personal property and real estate particularly described in the petition. She left no husband or natural child surviving her. The prayers were: (a) That the defendant be required to specifically perform the contract by paying to the petitioner the amount of money remaining in his hands for distribution among the heirs at law of Mrs. Alice Sherman, and by delivering to him all personal and real property in his possession after payment of her debts and the necessary expenses of administration thereon. (b) That the court enter a decree for specific performance of the contract, so molded as to carry out and give effect to the contract referred to in the petition. 3. For such other and further relief as the nature of the case may require. 4. For process. *Page 285 
The defendant answered, denying that the alleged contract was entered into or performed.
Upon the hearing the defendant made an oral motion to dismiss the petition on the ground that no cause of action was set forth against the defendant. This motion was overruled and no exception was taken.
The evidence upon the trial of the case was in some respects conflicting, but only the following need be stated as necessary to a decision here:
W. H. Dunn testified: "I know John Harold Lee. . . He was born close to the Southern shops in Atlanta . . at his grandmother's and grandfather's home. His mother is in the asylum at Milledgeville now. She has been an inmate of the sanitarium at Milledgeville ever since Harold was born. . . The last reports I had of her she was still living. I saw her at the time she was at home and gave birth to the child. . . I knew his father. His name was Lee. His given name was Warren. I don't know where he is but he is dead and buried. He died when Harold was small. . . When Harold's mother went back to Milledgeville he stayed at his grandmother's until he was big enough to go around to other places. He stayed at my house a good deal after he got big enough. When his grandmother died he was seven years old, I would say, or more; now, I'm not so positive on that because I don't keep these years, but he was a good-size child. After his grandmother's death he lived at my house the biggest portion of the time and at John Sherman's. He came to our house first to live after his grandmother died. My wife was his mother's sister, and Mr. John Sherman was my wife's brother. . . Harold's brother is named Carson and he had a sister. . . They first began living at my house as soon as they got big enough to come and play with the children. . . Mr. and Mrs. Sherman came to my house often. They talked with me about Harold. Mrs. Sherman, or Alice, as we called her, was attached to Harold. I say she seemed attached to him because she would promise him things, and his uncle would, too, and they promised to keep him and take care of him as their child. I heard them do it more than one time. She more especially wanted Harold to live with her. She would say things to entice him and promise him things and get him things to entice *Page 286 
him to come. He went and stayed with her, you might say, a good portion of his life, and when he got up to be a big-size child he would run away and come back to our house and play with the children, but they would come in behind him after him. . . She wanted him because she didn't have any children. . . When he went to live with her I heard her and Mr. Sherman talk to my wife in a family conversation, right together. I won't be positive about Mr. Sherman being present, but he was present in a lot of conversations, and, of course, because his wife wanted them he seemed to want them, too, and maybe wanted him. They said that what would be theirs would be his. . . His brother went over there and stayed part of the time. . . Harold went there first and last occasionally to look after his aunt and to take care of her. . . Mr. Sherman died first. He wasn't ill for some time. He died pretty suddenly. . . His wife lived several years after he died, but I couldn't say just exactly how long. After her husband's death she lived by herself part of the time. The boys lived there half of the time. . . I can not tell you the period of time Harold spent with Mr. and Mrs. Sherman after he was seven or eight years old. . . He stayed there until they had to send his aunt to the asylum, and then, of course, they came to my house. . . It was about three years after he went there the first time before they sent Mrs. Sherman to the insane asylum. . . He lived with Mrs. Sherman after she came back from the insane asylum. I can't tell you exactly how long he lived there, but he lived there at different times. . . I remember very well when Mr. Sherman died, but I don't remember the date. . . At the time Mr. Sherman died Harold probably did have a family of his own, living with them up in Atlanta and looking after them. . . As soon as these boys got big enough to work they both established their own families, and they both left Alice Sherman and her husband. . . They work at public jobs and were off on jobs ever since they have been big enough to work. . . When they got big enough to work each of them got jobs and finally they got married."
Carson Lee testified: "I am a brother of this boy, Harold Lee. I am 41 years old and Harold is 38. My mother is in the asylum at Milledgeville now and has been there ever since I can remember. I remember seeing my father once. . . I was five years *Page 287 
old the last time I saw him. Harold was born at that time; he was about two years old. When my grandmother died I lived with my uncle and aunt, Mr. and Mrs. Dunn, and Harold lived there with us. . . Harold lived with Mr. and Mrs. Dunn until he was about seven years old, and then our uncle and aunt came and got him, Mr. and Mrs. John Sherman. Mr. Sherman was my mother's brother. . . I think I know the circumstances under which he left. . . Mrs. Sherman asked my aunt if she could take him to live with her, and he apparently didn't want to go at that time, and she didn't want to let him go because she was taking care of us, and she asked my uncle and aunt both about it, so she finally made a proposition to them that they take him for two weeks, that she carry Harold over to her house and leave him two weeks, and if he still wanted to stay with them she would leave him, and if he wanted to come back she would take him and take care of him, and take him as her own child and leave him everything she had. At that time she didn't have anything very much, but so far as we knew she didn't have anything, but that was the proposition she made to get him. He went and stayed two weeks, and when he came back he wanted to go back with her, and she carried him, and that was their agreement. . . I ran away and went there. . . I heard my uncle, Mr. Sherman, make a statement this way. He said, `When I die I'll see the boys are taken care of. . . He included me after I went there. Mr. Sherman was present at Mr. and Mrs. Dunn's because they were there together. It was all right with him to take Harold over there. So far as I know he didn't say anything, but whatever she said was usually what went anyway, but he was there. He was in on the conversation. As to the kind of work we boys did when we grew up, I worked in a grocery store for about four years, and I have been a tile setter since that time. My brother also worked in a grocery store and set tile too. My uncle didn't have a farm or place for us to find employment. We were dependent on jobs by going out and getting them wherever we could find them. I don't know how old Harold was when he married, but he was grown. . . After my uncle died he lived with Mrs. Sherman a short period, but I don't know how long. . . Harold was in the service at one time. . . My uncle got him out, and he came back to my uncle's after that and lived *Page 288 
with them. . . Harold went to the Army at one time. It was a peace-time army, before the war. He came back and married, and he lived with my uncle and aunt. . . I don't know how long he stayed there, but it was some time."
Harold Lee testified: "I am 38 years old and I was born in 1909. . . I don't remember my father. . . I remember when I went to live with Mr. and Mrs. Dunn. I was around six and a half years old then. . . I lived with them a year or something like that; I don't know exactly. After I lived with them I lived with Mr. John Sherman. I lived with them from the time I was seven on up until they died, both of them, on and off. I wasn't there continuously, but that was my home. I was a tile setter and I worked for my uncle. He worked on jobs but through the shop, and in working on the job we traveled around, worked at one place, then traveled to another. I learned a trade. I studied the trade under John Sherman. I didn't make my home anywhere else except there with Mr. and Mrs. Sherman until I married. . . I wasn't married when my uncle died. I married in December after he died in July, I believe. . . My Aunt Alice died in 1942. . . I was born in 1909 and I have been married eleven years, I think."
The jury returned a verdict in favor of the petitioner, John Harold Lee, and judgment was entered for specific performance of the alleged contract, decreeing that he was entitled to have paid and delivered to him all moneys and properties of the estate, both real and personal, remaining in the hands of the administrator after the payment of debts and necessary expenses of administration, judgment being rendered for such moneys and properties, and jurisdiction being retained for the purpose of enforcing the decree.
The defendant filed a motion for new trial on the general grounds, and by amendment added two special grounds. In special ground 1, complaint is made that the court erred in admitting in evidence, over objection, the following testimony of James H. Voyles: "Mrs. Alice Sherman worked at Atlanta Woolen Mills from 1904 until she married. She didn't work after she married, and the money was made by Mr. Sherman. John [Sherman] made good money, there's no question about that." The testimony was objected to on the ground that it was irrelevant, immaterial, *Page 289 
and illustrated no issue in the case and was harmful and prejudicial to the movant's case, the movant then and now insisting that the admission of such testimony was harmful and reversible error, in that it injected into the case the question of a disposition of the estate of John Sherman, particularly since the judge in his charge to the jury drew, as the movant contends, a distinction between the relatives and the heirs at law of John Sherman and the relatives and heirs at law of Mrs. Alice Sherman in these words: "If you do not believe that this plaintiff is entitled to recover, then that would mean, gentlemen, that the law would take its course under the law of descent, and the heirs of Mrs. Sherman would automatically inherit this estate, that is, her brother and her deceased brother's sons and daughters, whoever they are;" and the evidence, taken in connection with the said charge, caused, as the movant contends, the jury to be influenced by their ideas as to which set of heirs, the heirs of John Sherman or the heirs of Alice Sherman, should inherit the estate, whereas the clear issue of fact presented was whether the alleged contract relied upon by the respondent had been proved as provided by law; and the movant insists that the said evidence was controlling and worked reversible error in this case.
The second special ground complains because the court charged the jury as follows: "I charge you, gentlemen of the jury, that if you should believe from the evidence that the plaintiff's mother was sent to the hospital and was incapable of aiding him in any manner, and you further believe that his father abandoned him and left him alone on the mercy of others, and I charge you that, if you believe further that his grandfather and grandmother died, and believe further that due to all these things happening he had to go live with Mr. and Mrs. Dunn and had no other place to go, and you believe that while he was at the home of Mr. and Mrs. Dunn that Mr. and Mrs. Sherman came there, both of them, and that both of the Shermans, Mr. and Mrs. Sherman, did make an agreement with Mr. and Mrs. Dunn to take this boy home, the plaintiff, as their adopted son, and you further believe that there was such agreement, that this plaintiff did go there and he did live with the Shermans as their son, and he did fulfill his part of the agreement, if there was such an agreement, then I charge you that the plaintiff would be entitled to recover in this *Page 290 
case." It is contended that the charge was error for the reasons: (1) it was not a correct statement of the law applicable to the pleadings and the evidence in the case; (2) it gives the right of disposition of minor children to any person in whose home they might happen to be in those instances in which parents can not exercise that powers; (3) the charge gave Mrs. Dunn, then living with her husband, equal authority with Mr. Dunn over the minor child; (4) the charge obligated Mrs. Alice Sherman equally with John Sherman, her husband, with whom she was then living, under the alleged contract; and (5) it destroyed the distinction between the husband and head of the household and the wife with respect to parental obligations and rights over children of the household.
The exception here is to the judgment overruling the amended motion for new trial.
1. Since the defendant administrator made a motion, in the nature of a general demurrer, to dismiss the petition as not setting forth a cause of action, and the judgment overruling the motion was unexcepted to, the following observations as to the legal status of the petition thereafter should be made. Proof of a case as laid in a petition will prevent a nonsuit, but there can be no recovery unless the case as laid authorizes it. Kelly v.Strouse, 116 Ga. 872 (4-d) (43 S.E. 280); Evans v.Josephine Mills, 119 Ga. 448 (46 S.E. 674); Goff v.National Bank of Tipton, 170 Ga. 691 (153 S.E. 767);Blount v. Metropolitan Life Insurance Co., 192 Ga. 325 (1) (15 S.E.2d 413). However, where a general demurrer is overruled and the judgment is unexpected to, the judgment becomes the law of the case. Dye v. Alexander, 195 Ga. 676 (1) (25 S.E.2d 419). The motion in the present case having been overruled, and that judgment not having been excepted to, the ruling became the law of the case that, upon proof of the allegations of the petition, the jury would be authorized to return a verdict in favor of the petitioner. It is, therefore, unnecessary for this court to ascertain whether or not a cause of action is alleged. That is settled by the law of the case, and the *Page 291 
only inquiry is whether or not the allegations of the petition are supported by proof, and if so supported the judgment of the trial court must be affirmed.
The evidence set out in the statement of facts is sufficient to prove the alleged contract of virtual adoption and full performance of it, both by the petitioner and Mr. and Mrs. Dunn, with whom he had been living and who acted in his behalf in making the contract. While it is apparent that he was absent from the home of the Shermans at intervals in his youth, the evidence should not be construed as showing a breach of the contract but as an experience that would normally and naturally be identified with the life of any real and maturing son. As he grew to sufficient age, he worked in a grocery store for a time, but John Sherman's occupation was that of a tile setter, and the petitioner and his brother Carson, who resided for a while in the Sherman home, where taught that trade by him. In time, besides working with their uncle, John Sherman, in their own home town, they traveled with him to different jobs in other places, and finally becoming proficient in the trade, pursued it on their own responsibility. As a result the petitioner was not constantly in the home of the Shermans, but it is fairly inferable that Mrs. Sherman, with a proper interest in the boy's development and progress, acquiesced in his tutelage by her husband and his trips away from home with him and subsequently the prosecution by the petitioner himself of the business of a tile setter. The petitioner testified: "I lived with them from the time I was seven up until they died, both of them, on and off. I wasn't there continuously, but that was my home. I didn't make my home anywhere else except there with Mr. and Mrs. Sherman until I married" at the age of 26.
2. Special ground 1 of the motion for new trial, complaining of the admission over objection of testimony of the defendant administrator to the effect that the money in the Sherman family was made by John H. Sherman, the husband of Mrs. Alice Sherman, is without merit for any reason assigned, since the defendant pleaded substantially the same facts in his answer.
3. The charge of the court, complained of in special ground 2 of the motion for new trial, on the ground that it erroneously stated the law applicable to the pleadings and evidence in the *Page 292 
case, is without merit, since, under the law of the case made by the judgment overruling the motion to dismiss the petition, the court's charge that the petitioner would be entitled to recover upon proof of the facts mentioned by the court and alleged in the petition, namely, those relating to the alleged contract of virtual adoption and compliance with it, was a legal and appropriate charge.
Judgment affirmed. All the Justices concur, except Bell, J.,absent on account of illness.